UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

ANDREW McDONALD, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

COMPELLENT TECHNOLOGIES, INC.,
PHILIP E. SORAN, JOHN R. JUDD, JOHN
P. GUIDER, CHARLES BEELER, and R.
DAVID SPRENG,

Defendants.

Case No. 10-CV-1566 (PJS/SER)

ORDER GRANTING
MOTION TO DISMISS

---

Jonah H. Goldstein and Michael F. Ghozland, ROBBINS GELLER RUDMAN &
DOWD LLP; Michael I. Fistel, Jr. and William W. Stone, HOLZER HOLZER &
FISTEL, LLC; Carolyn G. Anderson and Kirsten D. Hedberg, ZIMMERMAN REED,
PLLP; Jeffrey A. Berens, DYER & BERENS LLP, for plaintiff.

Wendy J. Wildung, Mary Cullen Yeager, and Justin P. Krypel, FAEGRE & BENSON
LLP, for defendants.

Defendant Compellent Technologies, Inc. ("Compellent") sells data-storage systems and

associated consulting services to businesses.[1]  Plaintiff Andrew McDonald brings this securities-

fraud action against Compellent and five of its officers and directors:  Philip E. Soran, chairman,

president, and CEO; John R. Judd, CFO; John P. Guider, COO and director; Charles Beeler,

---

[1]Compellent was acquired by Dell, Inc. in February 2011, after plaintiffs filed this suit,
and is now known as "Dell Compellent."  *See* Press Release, Dell Completes Acquisition of
Compellent Technologies, Inc. (Feb. 22, 2011), http://www.compellent.com/About-Us/
News-and-Events/Press-Releases/2011/110222-Dell.aspx.

director; and R. David Spreng, director.[2]  McDonald seeks to represent investors as a class, but no class has yet been certified.

McDonald alleges that defendants engaged in a fraudulent scheme to artificially inflate Compellent's stock price between October 28, 2009 and April 7, 2010 ("the class period"). Roughly speaking, plaintiffs allege that Compellent should have been more forthright with the market about the heavy discounts that it was offering to close sales.  McDonald also alleges that one of Compellent's revenue forecasts was too optimistic.  McDonald's claims are based mainly on two conference calls — the first on October 28, 2009 (about 3Q09 results), and the second on February 11, 2010 (about 4Q09 results and including revenue projections for 1Q10) — and the associated press releases.  McDonald contends that Compellent's stock fell to its accurate, uninflated price on April 8, 2010, after Compellent announced that it would miss its 1Q10 revenue forecast and the market "became fully aware of Compellent's true financial condition — Compellent could not generate sequential revenue growth without aggressive price discounts." Am. Compl. ¶ 8.

McDonald brings claims of securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and under the SEC's implementing regulation, Rule 10b-5, 17

---

[2]McDonald filed this action, which was docketed as case number 10-CV-1566.  A different plaintiff, Andrew Scull, filed a related action against the same defendants that was docketed as case number 10-CV-1525.  In each action, McDonald and Scull filed the identical amended complaint, which is labeled a "consolidated" complaint and includes both case captions. *See* Am. Compl., No. 10-CV-1566 [Docket No. 28]; Am. Compl., No. 10-CV-1525 [Docket No. 31].  Further, in each case, the parties filed identical papers with respect to Compellent's motion to dismiss.  The Court therefore consolidated the two cases under Fed. R. Civ. P. 42(a) into case number 10-CV-1566 and closed case number 10-CV-1525.  Order Apr. 25, 2011, No. 10-CV-1525 [Docket No. 46].  All references to docket numbers in the body of this order are to docket numbers in case 10-CV-1566.

C.F.R. § 240.10b-5.  Am. Compl. Counts I, III.  McDonald also brings claims of

controlling-person liability under § 20 of the 1934 Act, 15 U.S.C. § 78t.  Am. Compl. Count II.

Defendants move to dismiss for failure to state a claim.  For the reasons that follow, the Court

grants defendants' motion and dismisses McDonald's amended complaint with prejudice.

## I.  BACKGROUND

According to the allegations in the amended complaint (which the Court takes as true for

purposes of ruling on Compellent's motion), Compellent was formed in 2002 and went public in

2007.  Am. Compl. ¶ 9.  From 2006 through 2009, Compellent's revenues increased every

quarter.  *See id.*

Before and throughout the class period, Compellent did not sell directly to customers;

instead, it sold its storage systems and associated services through so-called "channel partners."

*Id.* ¶ 58.  Prices were negotiated on a deal-by-deal basis, and customers often received discounts.

*Id.* ¶¶ 57, 59.

The extent of these discounts affected Compellent's profitability.  Deals with higher

margins (i.e., smaller discounts) were obviously more profitable than deals with lower margins

(i.e., bigger discounts).  One measure of Compellent's profitability was its "gross margin" —

that is, the difference between Compellent's revenues and its cost of goods sold.  *Id.* ¶ 79; Jack

P. Friedman, *Dictionary of Business Terms* 291-92 (4th ed. 2007).

The heart of McDonald's case is his contention that during the class period, Compellent

misled investors about its gross margins.  Secondarily, McDonald alleges that Compellent misled

investors about its revenues.  The Court summarizes below the amended complaint's allegations

relating to Compellent's statements before and during the class period, Compellent's financial

performance, executive compensation, insider trading, and Compellent's stock prices.[3]

### A.  Pre-Class-Period Statements

Compellent held a conference call with analysts on April 30, 2009 to discuss

Compellent's financial results for 1Q09.  Am. Compl. ¶ 82.  Compellent's revenues grew over

the previous quarter (as they had grown for many consecutive quarters).  With respect to

profitability, Judd reported that Compellent's gross margin was 52.8 percent, compared to 52.5

percent for the same quarter in 2008.  *Id.*  Judd said that Compellent believed that product

margin "will bump back in the future" and "will be slightly higher in the remainder of the year."

*Id.*

On this conference call, an analyst asked two gross-margin-related questions:  First, what

were Compellent's long-term goals for gross margins?  Second, would Compellent ever walk

away from a deal because the margin on the deal was too low?  *Id.* ¶ 83.

Judd answered carefully.  He said that the "long-term model" for gross margin was

roughly two to three percentage points higher than the margin in the first quarter.  *Id.*  But he

also said, "I think that it's important to realize that we are trying to grow sales."  *Id.*  Further, he

said that Compellent would in theory walk away from a deal, "but we generally always find even

in a tough environment that we find ways to sell value and we get deals done."  *Id.*

─────────────────

[3]McDonald also alleges that Compellent dismissed its auditor in June 2010.  Am. Compl.
¶ 141.  The point of this allegation is not entirely clear, but it appears that McDonald means to
insinuate that Compellent dismissed its auditor to avoid scrutiny of Compellent's allegedly shady
practices.  The Court finds that the mere fact that Compellent dismissed its auditor for an
unknown reason in June 2010 — after the class period — has no bearing on whether Compellent
committed securities fraud during the class period.

Compellent held another conference call with analysts on July 29, 2009, to discuss Compellent's financial results for 2Q09. *Id.* ¶ 86. Compellent's gross margin grew to 53.7 percent, compared to 52.8 percent in the immediately preceding quarter. *Id.* ¶ 87. Compellent's revenues also grew over the previous quarter, and it forecast revenues of $30 million to $32 million for 3Q09. *Id.* Judd predicted that business in 3Q09 and 4Q09 — "especially" 4Q09 — would be "dominated" by business from new customers. *Id.* Soran noted that the revenue predictions were based on "visibility over [the sales] pipeline" created by the company's channel-partner-based sales model. *Id.* ¶ 88; *see also id.* ¶ 92 ("[W]e have a very, very good forecasting system . . . . I think most of the items that close in the second quarter you know about well — at least in the middle of the quarter . . . .").

With respect to gross margins in the rest of 2009, Judd said:

> I still think, like I said last quarter, that I will see some improvement in margin as we go through the year. Maybe this quarter will have more of a margin improvement than we just had. . . . I do expect that margins will improve over the next two quarters and into 2010, and we'll have to see what happens then in the next quarter.

*Id.* ¶ 88.

## B. Results for 3Q09

Compellent announced its 3Q09 results in a press release issued October 28, 2009. *Id.* ¶ 95. Compellent's revenues were $32.2 million, an increase of 12 percent over 2Q09 and an increase of 31 percent over 3Q08. *Id.* This amount matched the top of the forecast Compellent had made in late July. *See id.* ¶ 87. Soran was quoted in the press release as saying that the results "demonstrate strong momentum as customers see the value proposition of our efficient, scalable storage solutions. . . . [W]e continue to gain traction in the marketplace." *Id.* ¶ 95.

On a subsequent conference call with analysts, Soran described 3Q09 as "exceptional." *Id.* ¶ 96. Pointing to Compellent's operating income, Soran said that the number "demonstrates the progress we're making in growing our profits." *Id.* With respect to 2010, Soran said that Compellent expected "improvements in sales opportunities" and "continued strong growth in revenue." *Id.* Judd projected revenues of between $34 million and $36 million for 4Q09. *Id.* ¶ 97.

Judd also discussed the company's gross margin during the call. He reported:

> Our gross margin increased to 57.2% in the just-completed third quarter of 2009, compared to 53.7% in the second quarter of 2009. During the quarter, product margin was 52.3%, and support and services margin was 69.4%. The increase in product margin is a reflection of several strong margin deals versus margin improvements across all end users.

*Id.*

When an analyst asked Judd if this gross margin was "sustainable given the pricing and competitive environment," Judd responded:

> Great question . . . I think I'm going to encourage everybody to be a little more conservative than we were in this quarter. This was a really, really nice uptick in our . . . gross margin, on the product, and I would say that we have a good chance that it will come back a little bit. And I want to emphasize again . . . we go out there and compete every day for deals. And we're going to continue.

*Id.* ¶ 98.

When a second analyst asked for an explanation of the gross-margin increase in 3Q09 over 2Q09, Judd said:

> [W]e had several deals that were noticeably higher on margin that actually had some pretty good ticker size to them. It wasn't as if you could go across all of our deals and notice that each one was a fraction higher than it was in the previous quarter. . . . I think that

-6-

the big pop in it was more related to deals, some deals, versus
overall.

*Id.* Soran then chimed in, "But we were able to hold margins in a tough economic environment,"

and both Judd and Soran said that this was "really positive." *Id.*

### C. Changes to the Incentive Plan

In early November 2009 — six days after the conference call — Compellent's

compensation committee amended the company's incentive plan. *Id.* ¶ 107. The plan, which

had been adopted in February 2009, provided a schedule of bonuses for top executives based

mainly on Compellent's annual revenues and profitability. *Id.* ¶ 178.

Before the amendment, the incentive plan's 2009 revenue target was $141.1 million, and

bonuses would be paid on a sliding scale if Compellent hit at least 75 percent of the target

($106.1 million). *Id.* ¶ 183. After the amendment, the target was lowered to $130.2 million, but

bonuses would be paid only if Compellent hit at least 81 percent of the target ($105.5 million).

*Id.* ¶ 184.

The incentive plan's provisions regarding profitability, like those regarding revenue, had

two components: a target number and a threshold percentage at which bonuses would be paid.

The target number for profits was set at $6.8 million in February 2009 and was not amended. *Id.*

¶¶ 177, 186. But the threshold percentage was lowered from 100 percent in February 2009 to

only 54 percent after the October 28, 2009 conference call. *Id.* ¶ 186. Thus, after the

amendment, Soran, Judd, and Guider would be eligible for profitability-related bonuses once

Compellent made $3.67 million in profits, rather than the $6.8 million that had been required

before the amendment. *Id.*

*D.  Results for 4Q09 and Forecast for 1Q10*

Compellent announced its results for 4Q09 on February 11, 2010.  *Id.* ¶ 111.  Revenues for the quarter were $36.3 million.  *Id.* ¶ 112.  This was at the top of the range of projections given in October 2009 and represented a 13 percent increase over 3Q09 and a 35 percent increase over 4Q08.  *Id.* ¶¶ 97, 112.  Total annual revenue for 2009 was $125.3 million, almost $35 million higher than in 2008, and Compellent's annual net income was $4.8 million, compared to a loss of roughly $400,000 in 2008.  *Id.* ¶ 120.

Compellent's gross margin, however, declined in 4Q09.  Gross margin was only 52.9 percent for the quarter, compared to 57.2 percent in 3Q09, and 54.9 percent in 4Q08.  *Id.* ¶¶ 22, 113.  Soran commented on these results as follows:

> We did not see any significant changes from previous quarters in terms of competitive pricing pressure.  Our gross margins were lower than the third quarter, which as we've indicated during the last call they were exceptionally high.  But in general margins do fluctuate from quarter to quarter, but fourth quarter margins remained squarely within our business model.  Some factors that cause margins to vary include conscious decisions to win key footprints, lower priced entry systems, deferred revenue and supplier costs. We do not see any significant directional changes that would cause us to adjust our business model.

*Id.* ¶ 112.  With respect to balancing revenue growth and profitability, Soran said that "[a]t this stage of our development we will always focus on top line growth as a priority."  *Id.*

Judd also commented on the gross-margin figure.  He noted that Compellent's gross margin "varied considerably during 2009, from 57.2% to 52.8%."  *Id.* ¶ 113.  He attributed this variation to, among other things, "significant discounts [that] can be necessary to acquire strategic end users" and "tactical pricing of entry level systems to gain end users who in future periods will purchase upgrades."  *Id.*

Soran emphasized the same factors as Judd in response to an analyst's question about what factors were responsible for the quarter's low gross margin. Asked to "rank the factors in order of magnitude that hit the product margin," Soran replied:

> Well, the two big ones were probably the footprint deals we did and then, also, the margins you get on entry level deals, which you saw the result was we were able to get a lot of new end users that'll grow in the future and give good margins in the future.

*Id.* ¶ 114. When the analyst followed up by asking if such discounted "footprint deals" were a onetime event or would likely continue, Soran answered:

> Well, I don't know if I'd call it onetime in nature, but I would say it's — it won't be, you know, continual forever there. I mean we did guide to have a little bit of improved margins in the next quarter, so it's opportunistic and you take advantage of the opportunity when it faces you.

*Id.*

Looking forward, Soran said through a press release, "we remain positive about the growing demand for our innovative storage technology . . . ." *Id.* ¶ 120. Judd predicted "strong growth" in the first quarter of 2010 and forecast revenues for the quarter of $35 million to $37 million. *Id.* ¶ 121. Both Judd and Soran described the sales pipeline for the first quarter as "significantly better" than at the same time a year earlier. *Id.* ¶ 122. With respect to gross margins, Judd said:

> During the first quarter of 2010 we expect gross margins will be higher than the just completed fourth quarter, but throughout 2010 gross margins will continue to fluctuate but remain within our long-term goals.

*Id.* ¶ 121.

*E.  Results for 1Q10*

Compellent announced on April 7, 2010 — ahead of its ordinary quarterly announcement

schedule — that its actual revenue for 1Q10 would fall short of the company's February forecast.

*Id.* ¶ 131.  Instead of the predicted $35 million to $37 million in revenues, Compellent expected

to report revenues for 1Q10 of $31.5 million to $32.0 million.  *Id.*  On a conference call with

analysts that day, Soran provided four reasons why Compellent missed its revenue projections:

(1) seasonality, (2) delays in closing certain large deals, (3) certain management changes, and

(4) the generally tough economy.  *Id.* ¶ 132.

With respect to seasonality, Soran said that the first quarter is generally weak for the

industry, and that Compellent was affected by this weakness in 2010 more than in years past.  *Id.*

With respect to the large-deal delays, Soran said:

> We saw a number of larger opportunities in our pipeline slip into
> the second quarter of 2010.  We simply did not close nearly as
> many larger deals as compared to previous quarters.  While we had
> good new account growth in the quarter, the slippage of these
> larger deals resulted in a lower average deal size for the quarter.
> On the positive side, we have already received verbal
> commitments that we have won several of these deals and look
> [forward] to these contributing to future results.

*Id.*

Despite Compellent's revenue shortfall for 1Q10, Soran said during the April 7

conference call that gross margins for the quarter would be 1 to 2 percentage points higher than

in 4Q09.  *Id.*  This was consistent with Soran's statement in February 2010 that he expected "a

little bit of improved margins" in 1Q10 compared to 4Q09.  *Id.* ¶ 114.  Soran and Judd also told

analysts during the April 7 call that, unlike in 4Q09, Compellent did not close any highly

discounted "footprint deals" in 1Q10.  *Id.* ¶ 133 (Judd: "I would say the quarter flowed at least

for discounting extremely normal for normal [small/medium enterprise] type of deals, and I wouldn't say that we had any footprint deals.").

Compellent confirmed the information in the April 7 announcement on April 28, 2010, during its ordinary scheduled quarterly announcement. *Id.* ¶ 139.

### F.  Stock Sales

In mid-November 2009, not long after Compellent announced its results for 3Q09 and revised the incentive plan governing executive compensation, Compellent completed a secondary public offering. *Id.* ¶ 19. Specifically, Compellent issued 600,000 shares of stock on November 17, 2009. *Id.*

In connection with this secondary offering, Beeler, Spreng, Soran, and Guider sold some of their Compellent stock a week later, on November 23, 2009. *Id.* ¶¶ 19, 164-65, 168, 172, 174. (Judd did not sell stock during the class period.)  Beeler sold the largest block of shares: 1.75 million shares, amounting to about 44 percent of his holdings, for $32 million. *Id.* ¶ 164-65.  Spreng sold the next-largest block: 850,000 shares, or roughly 21 percent of his holdings, for $15.5 million. *Id.* ¶ 164, 168.  Soran sold the third-largest block: 130,000 shares, or roughly 10 percent of his holdings, for about $2.4 million. *Id.* ¶ 164, 172.  Finally, Guider sold the fewest shares: 100,000 shares, or 8.4 percent of his holdings, for $1.8 million. *Id.* ¶ 164, 177. As a group, they sold a total of 2.83 million shares at $18.29 per share, for almost $51.8 million in total proceeds. *Id.* ¶¶ 163-64.

### G.  Stock Prices

Compellent's stock traded at $17.96 as of October 28, 2009. *Id.* ¶ 105.  The next day, after Compellent announced its 3Q09 results, the share price rose to $18.84. *Id.*  And when

Beeler, Spreng, Soran, and Guider sold their shares in late November as part of Compellent's secondary offering, they received $18.29 per share. *Id.* ¶¶ 163-64.

Following these insider sales, Compellent's stock price *rose* substantially, reaching a class-period high of $24.40 on January 19, 2010. *Id.* ¶ 21. The price declined somewhat to $21.77 as of February 11, 2010, immediately before Compellent announced its 4Q09 results. *Id.* ¶ 23. After Compellent disclosed the results — including Compellent's failure to meet its revenue targets for 4Q09 — Compellent's stock price fell to $16.44. *Id.*

The price rebounded somewhat over the next several weeks. As of March 23, 2010, Compellent stock was trading at $18.74 per share. *Id.* ¶ 25. By April 7, 2010 — immediately before Compellent preliminarily announced its 1Q10 results — the share price had fallen to $17.56. *Id.* ¶ 28. After Compellent announced its disappointing revenues for 1Q10, its stock price fell sharply, to $13.02 per share. *Id.*

## II.  ANALYSIS

### A.  Standard of Review

In a private securities-fraud action, to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must satisfy not only the ordinary pleading standards applicable in every case, but also the heightened pleading standards set forth in the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).

Under Rule 12(b)(6), a court must accept as true a complaint's factual allegations and draw all reasonable inferences in the plaintiff's favor. *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008). Although the complaint's factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level" and to "state a claim to relief

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  In

assessing a claim's plausibility, the Court may disregard any allegation that is "conclusory."

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950-51 (2009) (holding that "conclusory" allegations "are

not entitled to the assumption of truth").

The PSLRA, 15 U.S.C. § 78u-4(b), modifies the Rule 12(b)(6) standard in two important

ways.  First, the complaint must "specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation regarding the statement

or omission is made on information and belief, the complaint shall state with particularity all

facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  This means that plaintiffs must

specifically allege such matters as the time, place, and contents of false representations, as well

as who made each misrepresentation. *In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th

Cir. 2002).

Second, the complaint must, "with respect to each act or omission alleged to violate this

chapter, state with particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  "Strong" means "strong."  Under the

PSLRA, it is not sufficient for the facts alleged to give rise to a weak or plausible or even

reasonable inference of scienter; instead, the facts alleged must give rise to a strong inference

that the defendants acted with the required state of mind. *Kushner v. Beverly Enters., Inc.*, 317

F.3d 820, 827 (8th Cir. 2003); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645,

660 (8th Cir. 2001).

Under these provisions of the PSLRA, the court disregards "catch-all" or "blanket"

assertions that do not satisfy the statute's particularity requirements. *Green Tree*, 270 F.3d at

660.  If the complaint fails to satisfy the PSLRA's requirements, it must be dismissed.  15 U.S.C.

§ 78u-4(b)(3)(A).

### B.  Claims

The core of McDonald's complaint is garden-variety securities fraud:  He alleges that

Compellent's officers made material misstatements or omissions that misled the market, and that

he was injured by these misstatements or omissions.  But McDonald also alleges that Compellent

and its officers unlawfully traded on inside information.

Insider trading can be evidence of a defendant's culpable state of mind in a garden-

variety securities-fraud cause.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 325 (2007) ("[P]ersonal financial gain may weigh heavily in favor of a scienter

inference . . . ."); *Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755, 766 (8th Cir. 2009)

(quoting *Tellabs*).  Alternatively, insider trading can, by itself, support an action under § 10 and

Rule 10b-5.  *See United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997) ("Under the

'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated

when a corporate insider trades in the securities of his corporation on the basis of material,

nonpublic information.").  A standalone insider-trading action, though brought under the same

laws and rules as a securities-fraud action, is in fact an analytically distinct cause of action.  *See*

*Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988) (distinguishing cases

involving "injury caused by affirmative misrepresentations which affected the market price of

securities" from "the analytically distinct problem of trading on undisclosed information").

On first read, McDonald's complaint appears to raise only a claim for garden-variety

securities fraud.  But in his response to Compellent's motion to dismiss, McDonald asserted that

he is, in fact, bringing both a claim for garden-variety securities fraud and a claim for insider trading.  The Court will therefore discuss both types of claims.  The Court will first discuss claims that arise only from alleged misrepresentations or omissions — that is, garden-variety securities-fraud claims.  The Court will then turn to possible insider-trading claims.

### 1.  Claims for Misrepresentations or Omissions

According to McDonald's own characterization, his complaint alleges garden-variety securities fraud under § 10(b) and Rule 10b-5.  Pl. Mem. Opp. Mot. Dism. at 15 [Docket No. 37].  To prevail on such a claim, McDonald must establish five things: (1) a material misstatement or omission by Compellent; (2) a connection between the misstatement or omission and the purchase or sale of securities; (3) scienter (that is, the intent to defraud) on Compellent's part; (4) reliance by McDonald on the misstatement or omission (also known as "transaction causation"); and (5) damages caused by the misstatement or omission (also known as "loss causation").[4]

---

[4]These five elements can be arranged in various ways, which leads to some superficial differences in how courts describe the elements of a securities-fraud action.  In *Dura Pharmaceuticals, Inc. v. Broudo*, for example, the Supreme Court enumerated six elements:

> (1) a material misrepresentation (or omission);
>
> (2) scienter, i.e., a wrongful state of mind;
>
> (3) a connection with the purchase or sale of a security;
>
> (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation";
>
> (5) economic loss; and
>
> (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

544 U.S. 336, 341-42 (2005) (citations omitted).

For its part, the Eighth Circuit has described a claim for securities fraud as having four

(continued...)

The heart of a garden-variety securities-fraud case — as this list of elements makes clear — is a material misrepresentation or omission by the defendant.  And under the PSLRA's elevated pleading requirements, a securities-fraud plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . . ."  15 U.S.C. § 78u-4(b)(1).

In opposing Compellent's motion to dismiss, McDonald quotes this statutory requirement but then immediately disregards it.  *See* Pl. Mem. Opp. Mot Dism. at 16.  In response to Compellent's argument that McDonald has failed to specify which of the numerous statements quoted in the complaint are allegedly misleading, McDonald directs the Court to 10 paragraphs in the complaint that ostensibly contain misleading statements (Am. Compl. ¶¶ 95-98, 112-14, 120-22) and another three paragraphs (¶¶ 106, 110, 130) that ostensibly contain "undisclosed

---

[4](...continued)

elements: "(1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit . . . ; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter . . .; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security."  *In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002).  *Cf. Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1533-34 (8th Cir. 1996) (arranging the elements into a slightly different four-element set).

Meanwhile, the Seventh Circuit has said that a securities-fraud plaintiff must prove six things: "that: (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages."  *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).  Although the Seventh Circuit's formulation includes the same number of elements as the Supreme Court's formulation in *Dura Pharmaceuticals*, the two courts arrange the elements differently.

Substantively, it makes no difference whether a securities-fraud action's elements are arranged into a group of four (as in some Eighth Circuit cases), a group of five (as by the Court), or somewhat different groups of six (as by the Supreme Court and the Seventh Circuit).

material information that rendered the statement" — a statement or statements that McDonald

has not specifically identified — "misleading . . . ."  Pl. Mem. Opp. Mot Dism. at 16.

The paragraphs cited by McDonald as containing misstatements amount to roughly

10 pages of single-spaced text.  Those paragraphs contain numerous statements (such as

statements about historical financial results) that McDonald does not allege are false.  Those

paragraphs also contain various statements that are emphasized through bold and italic type, but

McDonald never clearly asserts that these emphasized statements are false and never provides

the "reason or reasons" that the statements are false (if indeed he alleges that they are false).

In short, McDonald failed three times — in his complaint, in his response to

Compellent's motion to dismiss, and at oral argument — to "specify" Compellent's allegedly

false statements or material omissions.  Further, McDonald failed to identify the reasons why

any of Compellent's statements were misleading.  McDonald's complaint therefore falls short of

the PSLRA's requirements and must be dismissed.

For the sake of completeness, however, the Court will treat McDonald's statements at

oral argument as specifying the general contours of his claim.  As best as the Court can tell,

McDonald argues that Compellent misled investors by omission in two ways: (1) by failing to

disclose that, because of discounts, Compellent's gross margin in 4Q09 would be as low as it

was, and (2) by failing to disclose that Compellent's revenues would be as low as they were in

1Q10.

### a.  Gross-Margin-Related Disclosures

The Court agrees with Compellent that various rosy statements by individual defendants

about Compellent's business were either true or were mere puffery and thus not actionable.  *See*

*Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) ("[S]oft, puffing statements

generally lack materiality because the market price of a share is not inflated by vague statements

predicting growth." (internal quotation marks omitted)); *see also Detroit Gen. Ret. Sys. v.*

*Medtronic, Inc.*, 621 F.3d 800, 808 (8th Cir. 2010) (quoting *Parnes*).  For instance, in

commenting on Compellent's 3Q09 results, Soran was quoted as saying that "customers see the

value proposition of our efficient, scalable storage solution" and that Compellent "continue[s] to

gain traction in the marketplace."  Am. Compl. ¶ 95.  No reasonable investor would be misled by

such statements.

Similarly, Judd's statements about the 3Q09 results and his predictions about 4Q09 were

not misleading, even if Judd knew when he made them that Compellent was offering large

discounts to close sales.  Judd predicted 4Q09 revenues of "between $34 million and

$36 million," and that prediction turned out to be accurate.  *Id.* ¶¶ 97, 112.  In making this

prediction, Judd said, "We continue to see strong growth in our current pipeline and our

registered deal activity."  *Id.* ¶ 97.  This prediction also turned out to be accurate (as evidenced

by the company's record 4Q09 revenues), and, in any event, it was too vague to be actionable.

*See, e.g., Parnes*, 122 F.3d at 547.

With respect to Compellent's drop in gross margin in 4Q09, Compellent made no

materially misleading statements or omissions given the total mix of information provided by

Compellent.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (materiality depends on

the "total mix" of information); *In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 548 (8th Cir.

2004) ("Alleged misrepresentations can be immaterial as a matter of law if they . . . present or

conceal such insignificant data that, in the *total mix* of information, it simply would not

matter . . . ." (emphasis added)).  For one thing, even before the class period, Compellent alerted investors that top-line growth (i.e., revenue) was more important to Compellent than profitability (i.e., margins).  Specifically, Judd told analysts on April 30, 2009, in response to questions about Compellent's goals for gross margin, "I think that it's important to realize that we are trying to grow sales."  Am. Compl. ¶ 83.  And he suggested that Compellent was unlikely to walk away from even low-margin deals.  *Id.* ("[W]e generally always find even in a tough environment that we find ways to sell value and we get deals done.").

Further, when Judd was asked during the October 28, 2009 conference call about the company's record-high gross margin in 3Q09, he said, "I'm going to encourage everybody to be a little more conservative" about gross margins going forward.  *Id.* ¶ 98.  In other words, Judd cautioned that, going forward, the gross margins were likely to be *lower*.  Judd continued, "I want to emphasize again . . . we go out there and compete every day for deals.  And we're going to continue."  *Id.*  By "emphasiz[ing] again" that Compellent was "compet[ing] every day for deals," Judd was making the same point he made in April 2009:  Compellent's focus was top-line growth, not bottom-line growth.  Moreover, Judd explained that the record-high gross margin in 3Q09 was the result of specific individual deals with high margins, rather than an overall, sustainable increase in gross margins.  *Id.*

It is true that both Soran and Judd said during this conference call — soon after Judd cautioned analysts to be "a little more conservative" about future gross margins — that it was "really positive" that Compellent had a good gross margin in 3Q09.  *Id.*  But this was *true*: Compellent's gross margin in 3Q09 *was* very good.  McDonald's theory seems to be that Soran and Judd should have been less optimistic about Compellent's prospects and, rather than telling

analysts to be "a little more conservative" about gross margins, they should have told analysts to

be "somewhat more conservative" or "a lot more conservative."  In other words, McDonald's

theory seems to be that Soran and Judd are liable for securities fraud because they did not tell

analysts that "gross margins will be much worse in the next quarter."[5]

The Court rejects McDonald's theory.  Even if Soran and Judd in fact knew, at or shortly

after the October 28, 2009 conference call, that Compellent's gross margin for 4Q09 would be

around 52.9 percent (the actual number, reported in February 2010), they did not materially

mislead the market by telling analysts to be "a little more conservative" with gross-margin

estimates.  As Soran said in February when commenting on the 4Q09 results, the 52.9 percent

gross margin was "squarely within [Compellent's] business model."  *Id.* ¶ 112.  Indeed, the 4Q09

gross margin was not the lowest quarterly figure in 2009; that distinction goes to 1Q09, during

---

[5]McDonald also seems to base his claims in part on statements made by analysts, not by
Compellent executives.  Pl. Mem. Opp. Mot. Dism. at 22-23.  But McDonald's reliance on
analysts' statements adds nothing to his allegations about Compellent's executives, because
McDonald argues only that the executives expected analysts to repeat what the executives
themselves said.  *Id.* ("Any argument that defendants did not intend for analysts to communicate
defendants' statements to the market is disingenuous.").  The Court agrees with McDonald —
and Compellent does not dispute — that Judd and Soran expected analysts to rely on and repeat
their statements.  The problem for McDonald is that those statements were not materially false or
misleading.

Further, to the extent that analysts made inaccurate predictions based on truthful
statements by Compellent, the complaint's allegations would not support a finding that
Compellent was so "entangled" with the analysts that Compellent assumed a duty to correct
those predictions.  *See In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002)
("Generally, securities issuers are not liable for statements or forecasts disseminated by
securities analysts or third parties unless they have 'sufficiently entangled [themselves] with the
analysts' forecasts [so as] to render those predictions 'attributable to [the issuers].'" (quoting
*Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980); alterations in *Navarre
Corp.*)).  The Court therefore disregards the analysts' statements in assessing the sufficiency of
Compellent's complaint.

which Compellent's gross margin was 52.8 percent, *see id.* ¶¶ 82, 87, one-tenth of a percentage

point lower than the gross margin in 4Q09 that McDonald complains about.

It is also worth noting that, although Compellent's stock price fell after the February

2010 announcement of the 4Q09 results, the drop was small relative to the stock price

immediately after the October 2009 announcement of the 3Q09 results.  Before the October 2009

announcement that McDonald complains was insufficiently bearish, Compellent stock traded at

$17.96 per share; after the announcement, it traded at $18.84.  *Id.* ¶¶ 15-16.  After the February

2010 announcement, it traded at $16.44.  *Id.* ¶ 23.  While this was a steep decline relative to the

class-period high of $24.40 on January 19, 2010, *id.* ¶ 21, it was only 13 percent below the stock

price immediately after the October 2009 conference call.  This further supports the Court's

conclusion that, during and after that conference call, no defendant made a material misstatement

or omission about Compellent's gross margins.

Because the complaint's allegations, even if true, do not establish that any defendant

made a material misrepresentation or omission with respect to Compellent's gross margins, it

follows that no defendant had the requisite scienter to support a securities-fraud claim.

The incentive-plan changes in November 2009 and the stock sales that followed shortly

thereafter *do* suggest the possibility that the individual defendants may have traded based on

their knowledge of Compellent's probable gross margin for 4Q09.  And if Compellent had made

a misrepresentation or omission, the trades would provide some evidence of scienter.  *See, e.g.*,

*Tellabs, Inc.*, 551 U.S. at 325; *Horizon Asset Mgmt.*, 580 F.3d at 766 (quoting *Tellabs*).  In the

absence of any such misrepresentation or omission, however, the trades relate only to a potential

insider-trading claim, which is analytically distinct from a garden-variety securities-fraud claim, *see Deutschman*, 841 F.2d at 506, and which is addressed below.

### b. Revenue-Related Disclosures

During the February 11, 2010 conference call, Judd forecast revenues of $35 million to $37 million for 1Q10 — a forecast that he described as reflecting "strong growth in our current pipeline and our registered deal activity."  Am. Compl. ¶ 121.  He also projected that gross margin for 1Q10 would be higher than the disappointing gross margin in 4Q09.  *Id.*

The gross-margin forecast proved accurate.  *Id.* ¶¶ 132, 139.  The revenue forecast did not.  Actual revenues for 1Q10 were between $31.5 million and $32.0 million, or roughly $3 million to $5 million below projections.  *Id.*

Forecasts are, of course, estimates.  Estimates by their very nature often prove to be inaccurate.  Section 10(b) and Rule 10b-5 do not prohibit forecasts that are *inaccurate*; they prohibit forecasts that are *lies*.  *See Parnes*, 122 F.3d at 547.  And thus, under the PSLRA, to prevail on a securities-fraud claim that is based on an inaccurate forecast, a plaintiff must show that a defendant had "actual knowledge" that the forecast was "false or misleading" when it was made.  15 U.S.C. § 78u-5(c)(1)(B).  The amended complaint's allegations, even if true, do not give rise to a strong inference that at the time Judd provided his forecast of 1Q10 revenues, Judd had "actual knowledge" that his forecast was false.[6]

---

[6]Compellent also argues that Judd's revenue forecast fell within the PSLRA's safe harbor for forward-looking statements and is therefore not actionable.  Def. Mem. Supp. Mot. Dism. at 15-17.  Because the Court rejects McDonald's forecast-based claim for a different reason, the Court need not decide whether the safe harbor applies.

Most of the allegations on which McDonald relies to show a wrongful state of mind on the part of Compellent and its executives relate to the October 2009 conference call, not to the February 11, 2010 call during which Judd made his inaccurate revenue forecast. Specifically, McDonald relies heavily on the changes to the executive-compensation plan made in November 2009 and the stock sales by defendants a few days later. Pl. Mem. Opp. Mot. Dism. at 32-39. These facts do not remotely suggest that Judd (or any other Compellent executive) had actual knowledge on February 11, 2010 that Compellent's 1Q10 revenues would fall short of the forecast made by Judd that day.

It is true that Compellent regularly touted its "visibility" into its sales pipeline. *See, e.g.*, Am. Compl. ¶ 88. And Judd said, in August 2009, that Compellent generally knows about "most" of the sales that it will close in a quarter by "at least in the middle of the quarter . . . ." *Id.* ¶ 92. This suggests that Judd's forecast on February 11, 2010 of Compellent's 1Q10 sales should have been well informed.

But even well-informed forecasts often turn out to be wrong. And Soran said, when he announced on April 7, 2010 that Compellent would miss the 1Q10 revenue forecast, that one reason for the shortfall was that Compellent "saw a number of larger opportunities in our pipeline slip into the second quarter of 2010." *Id.* ¶ 132. This explanation — which is facially plausible and which the complaint provides no reason to doubt — is consistent with Judd's having actually believed, on February 11, 2010, that Compellent's revenues for 1Q10 would meet his forecast.

Thus, the complaint's allegations provide little reason to believe that Judd (or any other defendant) had actual knowledge on February 11, 2010, that Compellent's revenues for 1Q10

-23-

would be below the $35 million to $37 million that Judd projected.  Because the complaint falls

far short of supporting a "strong" inference of scienter with respect to Judd's revenue forecast,

McDonald's securities-fraud claims must be dismissed insofar as they are based on that forecast.

### 2.  Insider-Trading Claims

Section 10(b) forbids the use of "any manipulative or deceptive device" in connection

with the purchase or sale of a security and in violation of SEC rules.  15 U.S.C. § 78j(b).

Rule 10(b)(5) implements § 10(b) by prohibiting, among other things, "engag[ing] in any act . . .

which operates or would operate as a fraud or deceit upon any person, in connection with the

purchase or sale of any security."  17 C.F.R. § 240.10b-5(c).  And Rule 10b5-1, adopted in 2000,

specifically codifies the longstanding principle that insider trading — i.e., buying or selling stock

on the basis of material, nonpublic information about that stock "in breach of a duty of trust or

confidence" owed to the issuer, its shareholders, or the source of the information — is a

"manipulative and deceptive device" prohibited by § 10(b) and Rule 10b-5.  17 C.F.R.

§ 240.10b5-1(a); *see also O'Hagan*, 521 U.S. at 652 (holding that insider trading based on

material, nonpublic information "qualifies as a 'deceptive device' under § 10(b)").

Further, Congress created an express private cause of action for insider trading in 1988,

when it added § 20A to the 1934 Securities Exchange Act.[7]  Under § 20A:

> Any person who . . . purchas[es] or sell[s] a security while in
> possession of material, nonpublic information shall be liable . . . to
> any person who, contemporaneously with the purchase or sale of

---

[7]Insider Trading and Securities Fraud Enforcement Act of 1988 ("ITSFEA"), Pub. L.
No. 100-704, 102 Stat. 4677, codified at 15 U.S.C. § 78t-1.  For a general discussion of ITSFEA
and § 20A, see William K.S. Wang & Marc I. Steinberg, *Insider Trading* § 6.2, 496-507 (3d ed.
2010).

> securities that is the subject of such violation, has purchased . . . or
> sold . . .  securities of the same class.

15 U.S.C. § 78t-1(a).  It is not entirely clear whether the express insider-trading claim created by

§ 20A displaces the pre-existing insider-trading claim allowed under § 10b and Rule 10(b)(5),

but the Court will assume that it does not.  *See generally* William K.S. Wang & Marc I.

Steinberg, *Insider Trading* § 6.3, 508-19 (3d ed. 2010); *see also Johnson v. Aljian*, 490 F.3d 778,

780-83 (9th Cir. 2007) (discussing relationship between § 20A and § 10(b)).

The prohibition on insider trading is often described as the disclose-or-abstain rule.  *See,*

*e.g.*, *Vacold LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008).  Under this rule, "corporate

insiders must either disclose material inside information known to them or refrain from trading

in the shares of the corporation."  *Laventhall v. Gen. Dynamics Corp.*, 704 F.2d 407, 410 (8th

Cir. 1983); *see also SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (en banc).

There is no dispute that Compellent and all individual defendants except Judd sold stock

in November 2009.  And McDonald alleges, in a single sentence at the end of Count III of the

amended complaint, that the individual defendants "traded Compellent shares while in

possession of material, non-public information."  Compl. ¶ 219(c).

McDonald's complaint fails to adequately plead an insider-trading claim, even under the

relatively low pleading requirements of Fed. R. Civ. P. 8(a).  The single sentence at the end of

Count III — even when read in the context of the complaint as a whole — is not sufficient to

"raise a right to relief above the speculative level" and to "state a claim to relief that is plausible

on its face."  *Twombly*, 550 U.S. at 555, 570.  And thus, if McDonald indeed intended to plead

an insider-trading claim, his claim would be dismissed for that reason alone.

In fact, though, it seems unlikely that McDonald truly intended to pursue an insider-trading claim.  His complaint reads overwhelmingly like a complaint for garden-variety securities fraud, not for insider trading.  That is certainly how the Court read the complaint, and that is how Compellent also read the complaint, as reflected by Compellent's memorandum in support of its motion to dismiss.  In particular, when summarizing the law governing McDonald's claim for "securities fraud," Compellent said: "Plaintiffs must allege that, in connection with the purchase or sale of a security: (1) Defendants made a material misrepresentation or omission; (2) with scienter; (3) on which Plaintiffs justifiably relied; and (4) that caused Plaintiffs to incur economic loss."  Def. Mem. Supp. Mot. Dism. at 7.  To the extent that Compellent discussed the complaint's insider-trading allegations, Compellent did so only in connection with the scienter element of a garden-variety securities-fraud claim.  Def. Mem. Supp. Mot. Dism. at 27-29.

McDonald responded in kind.  McDonald described the elements of "securities fraud under Rule 10b-5" essentially identically to Compellent.  Pl. Mem. Opp. Mot. Dism. at 15.  And McDonald discussed the individual defendants' November 2009 stock sales primarily as evidence of scienter with respect to garden-variety securities fraud, not as standalone insider-trading violations.  Pl. Mem. Opp. Mot. Dism. at 34-39.  Only once — in a single paragraph toward the end of a lengthy brief — did McDonald suggest that he was bringing a claim for insider trading separate from his claim for ordinary securities fraud.  Pl. Mem. Opp. Mot. Dism. at 28-29 ("Inside traders do not have to make false statements to be held liable [under §10(b))]. . . .  Thus, defendants Guider, Beeler and Spreng are liable for selling massive quantities of stock while in possession of material inside information.").  And although

McDonald briefly mentioned at oral argument that defendants could be liable for insider trading

alone, he did so only after the Court's questions made it clear that the Court doubted that

McDonald had adequately pleaded any material misrepresentation or omission.

Even if McDonald truly intended to pursue an insider-trading claim — and even if the

Court were not required to dismiss that claim because it was not pleaded in adequate detail —

the Court would likely dismiss the claim because nothing in the complaint suggests that

McDonald is entitled to pursue an insider-trading claim against any defendant.  The Court notes

that neither party briefed the question of whether McDonald is a proper insider-trading plaintiff.

This lack of briefing reflects the fact that, as the Court has noted, it is doubtful that McDonald

intended to pursue such a claim in the first place.  Given this lack of guidance from the parties —

and given the complexity of this area of the law — the Court's conclusions about who can bring

an insider-trading claim (and under what authority) are necessarily tentative and may have to be

revisited in a future case.  But based on the limited research done by the Court, McDonald does

not appear to have "standing" to pursue an insider-trading claim against defendants.

To the extent that McDonald brings an insider-trading claim under § 20A — a statute not

cited in his complaint or in either side's memoranda on Compellent's motion to dismiss — the

claim plainly fails.  A plaintiff can sue under § 20A only if the plaintiff traded

"contemporaneously" with the alleged insider trader.  15 U.S.C. § 78t-1(a).  McDonald does not

allege that he did so.

To the extent that McDonald brings an insider-trading claim under §10(b) and Rule 10b-

5, his claim appears to fail for a similar reason:  He does not seem to be a proper plaintiff.

Although no Eighth Circuit case has expressly defined who may bring an insider-trading claim,

the Court discussed the issue at length in *Laventhall v. General Dynamics Corp.*, 704 F.2d 407

(8th Cir. 1983).  In discussing whether an options holder could sue for insider trading, *Laventhall*

said:

> It is important . . . to emphasize that no cause of action arises under
> section 10(b) or rule 10b-5 simply because an insider has inside
> information and fails to disclose it.  The duty arises only where
> there is a breach of the rule that an insider must "disclose or
> abstain" from trading.  The *sine qua non* in every private action
> under section 10(b) is unauthorized trading of securities in the
> same market as the persons damaged. . . . Had plaintiff been
> *contemporaneously trading* in the same market, that is, buying and
> selling common stock at the same time defendant was trading,
> there would arguably exist a *transactional nexus* that defendant
> had profited through the purchase of stock, whereas plaintiff
> *contemporaneously* had sustained a loss through the sale of his
> stock due to the imbalance of information.  The legal justification
> for liability of the corporate insider to the outside uninformed
> investor is that if the insider trades on the basis of the inside
> information it may profit at the expense of outside investors who
> are disadvantaged in *the same or similar transaction* by lack of the
> inside information. Thus, in this hypothetical transaction there is a
> *direct nexus* between the defendant's gain and the plaintiff's loss.

*Id.* at 412 (emphasis added; citations omitted).  *Laventhall* rejected the option holder's claim for

insider trading because the option holder transacted not with the corporation or a corporate

insider, but rather with a third party.  *Id.* at 412-13.  In doing so, *Laventhall* suggested that

contemporaneous traders — the same class of plaintiffs expressly permitted to sue under § 20A

— might be able to sue a defendant for insider trading.  *Id.* at 412.

Laventhall is consistent with decisions of other federal courts that have allowed insider-

trading claims to be brought by plaintiffs who were actually or potentially on the other side of an

allegedly unlawful insider trade — namely, counterparties and contemporaneous traders.  *See*

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972) (insider-trading

-28-

claim brought by counterparties); *Wilson v. Comtech Telecommc'ns Corp.*, 648 F.2d 88, 94-95 (2d Cir. 1981) ("Any duty of disclosure is owed only to those investors trading contemporane-ously with the insider; non-contemporaneous traders do not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information."); *Fridrich v. Bradford*, 542 F.2d 307, 326 (6th Cir. 1978) (Celebrezze, J., concurring) ("The duty of disclosure is owed to the class of investors trading contemporaneously with the insider . . . .").

McDonald has not alleged that he was on the other side of an insider trade — and, as already noted, McDonald has not alleged that he traded contemporaneously with any defendant accused of insider trading.  It therefore appears that, even if the insider-trading claim had otherwise been pleaded with adequate specificity, the Court would have to find (in light of *Laventhall*) that McDonald has not alleged a sufficient transactional nexus between his trades and the challenged insider trades.

### III.  CONCLUSION

Compellent's stock price fell over the course of the class period.  Various insiders made a lot of money by selling Compellent stock before the price fell.  And Compellent executives made some optimistic statements that turned out, in hindsight, to have been too optimistic.  These facts do not amount to securities fraud, and McDonald does not appear to be a proper plaintiff in an insider-trading action.

The Court will not grant Compellent's perfunctory, last-minute request for leave to amend its complaint.  Pl. Mem. Opp. Mot. Dism. at 42.  That request was not made by any motion — much less a motion that complies with the rules of this Court — and that request was

unsupported by any hint of how Compellent proposes to amend its complaint to cure its deficiencies. *See, e.g.*, *In re 2007 Novastar Fin. Inc. Sec. Litig.*, 579 F.3d 878, 884-85 (8th Cir. 2009) (affirming district court's denial of plaintiffs' request for leave to amend where request was virtually identical to McDonald's request).

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  The motion to dismiss of defendant Compellent Technologies, Inc. [Docket No. 32] is GRANTED.

2.  Plaintiff's complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August  1 , 2011                    s/Patrick J. Schiltz
                                            Patrick J. Schiltz
                                            United States District Judge